IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

RHONDA MOLING,

     Plaintiff,

v.                            No. 09-1100

O'REILLY AUTOMOTIVE, INC.,

     Defendant.
_____

ORDER GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT
_____

## *INTRODUCTION*

     The Plaintiff, Rhonda Moling, initially brought this action against the Defendant, O'Reilly

Automotive, Inc. ("O'Reilly"), in the Circuit Court for the Twenty-Sixth Judicial District at Jackson,

Tennessee on March 16, 2009, alleging sexual harassment, discrimination on the basis of gender,

and retaliation in violation of the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-

101, *et seq.* ("THRA"). The matter was removed to this Court on April 24, 2009 on diversity of

citizenship grounds. Before the Court is the Defendant's motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure.

## *STANDARD OF REVIEW*

     Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] "The district court must construe the evidence

_____

[1]While this motion was pending, the text of Rule 56 changed. "This change was meant to
"carr[y] forward the summary-judgment standard expressed in former subdivision ©." AT&T,
Inc. v. United States, ___ F.3d ___, 2011 WL 9729, at *5 (5th Cir. Jan. 4, 2011) (quoting Fed. R.

and draw all reasonable inferences in favor of the nonmoving party." <u>American Civil Liberties Union of Ky. v. Grayson County, Ky.</u>, 591 F.3d 837, 843 (6th Cir. 2010), *reh'g denied*, 605 F.3d 426 (6th Cir. 2010) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "The opposing party must present more than a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find for the non-movant." <u>Defoe ex rel. Defoe v. Spiva</u>, 625 F.3d 324, 330 (6th Cir. 2010) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>In re Morris</u>, 260 F.3d 654, 665 (6th Cir. 2001) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

*FACTS*

The facts as construed in the light most favorable to the nonmoving party are as follows. O'Reilly owns and operates thousands of automotive parts stores nationwide. (Dep. of Fred Carrington ("Carrington Dep.") at 24.) At the times the relevant acts occurred, Fred Carrington was a district manager overseeing approximately nine O'Reilly stores, including the two located in Jackson, Tennessee. (<u>Id.</u> at 24, 38.) He focused on making the stores profitable and interacted primarily with store managers; he had no involvement in the day-to-day operations of the various locations unless a manager was having a problem. (<u>Id.</u> at 16.) Carrington also trained store managers and, to some extent, assistant managers. (<u>Id.</u> at 20.) Managers were provided with

---

Civ. P. 56 advisory committee note (2010 Amendments)).

training manuals and all employees were trained with respect to the company's sexual harassment policy.  (Id. at 20, 49.)

The Jackson locations consisted of a "north store" (1172) that employed approximately eleven to twelve persons and a smaller "south store" (1284).  (Id. at 22-23.)  Bob Stonehouse, who was based in Oklahoma City, worked as the regional loss prevention auditor for some fifty O'Reilly stores, including those in Carrington's district.  (Id. at 44-45.)  Generally speaking, Stonehouse performed full store audits on an annual basis.  (Dep. of Robert Eugene Stonehouse ("Stonehouse Dep.") at 29.)  The audits entailed "[t]ak[ing] a look at their paperwork, making sure that store managers are following procedures, counting money, making sure the money is being counted correctly, [and] mak[ing] sure that the procedures that O'Reilly asks [of] them on an everyday basis" are followed.  (Id. at 32.)  The audits were conducted pursuant to certain criteria, set out on an "audit list" used for every store.  (Id.)

Moling was hired as a parts specialist at the north store on January 15, 2008 by Carl Ouellette, the store's manager.  (Compl. ¶ 6; Am. Statement of Undisputed Material Facts in Supp. of Def. O'Reilly Auto., Inc.'s Am. Mot. for Summ. J. ¶ 12; Carrington Dep. at 37.)  The job required her to work the store's counter selling automotive parts.  (Carrington Dep. at 36-37; Am. Statement of Undisputed Material Facts in Supp. of Def. O'Reilly Auto., Inc.'s Am. Mot. for Summ. J., Ex. 6.)  She was promoted to the store manager position at the south Jackson location as of March 16, 2008.  (Carrington Dep. at 38; Dep. of Rhonda Moling ("Moling Dep.") at 277, 280, 289.)

In March 2008, shortly after Moling's promotion, Stonehouse was in the area to attend a store manager's meeting conducted by Carrington to address shrinkage.[2]  (Stonehouse Dep. at 35,

---

[2]"Shrinkage" is defined by Stonehouse as "any kind of loss."  (Stonehouse Dep. at 35.)

38-39.) The meeting was to occur in the banquet room of a Jackson hotel. (Id. at 38-39.) He was asked to stop by the south store on his way to the event in order to meet Moling. (Id. at 35.) During the subsequent store manager's meeting, he spoke with her again one-on-one concerning business matters. (Id. at 35, 39.)

Stonehouse denies meeting privately with Moling at the store or that anything unusual happened. (Id. at 39-40.) On the other hand, the Plaintiff recalled the following acts took place during Stonehouse's March 2008 visit to the south store. After they were introduced and she and Stonehouse stood outside the store's office, the auditor brushed her hand and said, "Do you know people can pass audits without me even going through the drawers?" (Moling Dep. at 291-92, 305.) She replied, "Excuse me?" and he repeated his statement. (Id. at 292.) Moling told him, "Well, I think you need to go through those [drawers] because you're not getting in mine" and walked away toward the front counter. (Id.). She was assisting with a customer and went to retrieve an invoice from the nearby printer when Stonehouse stepped up and held out his hand. (Id. at 292-93.) He said, "Let me show you something" and then asked, "Didn't you notice?" (Id. at 293.) When Moling indicated she did not know what he was talking about, he said, "The ring comes off," referring to his wedding band. (Id.)

She contends that she and Stonehouse proceeded into the store office to look over the audit list. (Id.) As they did so, he explained that his wife had been in a car accident and was unable to engage in sexual activity due to pins in her hips and back. (Id.) The auditor at one point looked at her, grinned, and said, "Oh, your eyes are just so pretty." (Id. at 313-14.) He also asked if he could spend the night at her house instead of the hotel and run her a bubble bath. (Id. at 293, 307-08.) She refused and started to walk out of the office when he said, "All right. Come back in here. We'll just

go over the checklist." (<u>Id.</u> at 293.) One of the items on the list involved the store safe, which was located behind the door of the tiny office and required the door be closed in order to reach it. (<u>Id.</u> at 294.) As Moling moved toward the safe, Stonehouse closed the door, leaned her back against the desk and attempted to kiss her on the mouth. (<u>Id.</u>) The Plaintiff rebuffed him and again left the office, not to return until he left the store a few hours later. (<u>Id.</u> at 294-95.) During that time, however, he stared and smiled "cutesy" at her. (<u>Id.</u> at 295.) Moling continued to remind Stonehouse he was married and tell him she was not interested in having an intimate relationship with him. (<u>Id.</u> at 294-323.)

She did not report the incident to management at the time because Stonehouse "wasn't around a lot." (<u>Id.</u> at 343.) Indeed, after the events at the store, Moling saw Stonehouse on only a couple of occasions. (<u>Id.</u>) From the March incident to the time she left O'Reilly to have colon surgery in June 2008, he sometimes phoned and engaged in "little flirty talk," such as questions about what she was wearing or whether she needed a massage, whereupon she hung up. (<u>Id.</u> at 346-47, 351.) She described other calls as a brief couple of sentences of such talk and then he would move on to business matters. (<u>Id.</u> at 347.) The Plaintiff stated in her deposition that he "wasn't just pounding the harassment," because she would hang up on him. (<u>Id.</u>) Sometimes, his calls were strictly business. (<u>Id.</u> at 348.) She estimated the "flirty" calls occurred three or four times. (<u>Id.</u> at 351.)

In June 2008, the Plaintiff called Ouellette, her former manager who was still at the north store, on approximately two occasions with questions. (<u>Id.</u> at 286, 357.) He had asked her to do so if she needed help. (<u>Id.</u>) Apparently, however, Ouellette's wife, from whom he was separated, took offense to her calls. (<u>Id.</u> at 357-58.) Moling referred to this in her deposition as a "minor" incident. (<u>Id.</u> at 357.) Carrington told her to stop phoning, as Ouellette's "wife is really taking it the wrong

way." (Id. at 357-58, 365; Carrington Dep. at 71.) In her deposition she said it was no problem; she simply called someone else for help. (Moling Dep. at 358.)

On June 21, 2008, the Plaintiff left her employment to have colon surgery. (Id. at 368.) She had been working for O'Reilly for only five months and was ineligible for leave under either the Family and Medical Leave Act or the company's leave policy. (Id.) Thus, she was terminated and, on August 25, 2008, rehired as assistant manager of the north store under Ouellette's supervision. (Am. Statement of Undisputed Material Facts in Supp. of Def. O'Reilly Auto., Inc.'s Am. Mot. for Summ. J. ¶ 20; Moling Dep. at 405-06.)

Ouellette soon went on leave himself for back surgery from September 8 to October 27, 2008. (Am. Statement of Undisputed Material Facts in Supp. of Def. O'Reilly Auto., Inc.'s Am. Mot. for Summ. J., Ex. 11.) Even after he went out for his operation, if Moling needed to speak with him, one of the men in the store had to make the call for her. (Moling Dep. at 360.)

Ouellette apparently found the whole thing amusing and would talk about his estranged wife's jealousy of Moling when he was at the store within earshot of customers and other employees. (Id. at 359.) After he returned from surgery in September 2008 and had reconciled with his wife, Ouellette announced in front of everyone in the store that, "If I don't hurry up and get you (Moling) out of this store, my wife is going to leave me." (Id. at 360.) According to the Plaintiff, it was an everyday thing. (Id. at 360-61.) He would grin and tell her in a joking way that his wife would throw him out of the house if he didn't get Moling out of his store. (Id.) He never threatened to fire, demote or discipline her. (Id.) She tired of it, however, because he was loud and sarcastic about it. (Id. at 363-64.) Ouellette admits telling the Plaintiff in passing that she should not call his house because his wife was jealous, but that he nonetheless asked her to call if she needed anything.

(Dep. of Carl Ouellette ("Ouellette Dep.") at 19.)

On October 8, 2008, the Plaintiff alleges that Stonehouse again came to her location and set up his computer in the store's office, all the while making "goo-goo eyes" at her as she worked the counter. (Moling Dep. at 385-90.) The two spoke in the office about a used part that was returned as new for a refund. (Id. at 391-92.) As he was leaving the store some time later, she contends that he walked past her as she stood at the counter and said, "Are you coming to the hotel tonight?" (Id. at 394.) When she refused, he said, "Well, just tell me what you drink, and we'll go and have a drink in public if you don't feel safe coming to my hotel. I just want to run you a bubble bath and give you a back massage, or a full body massage." (Id.) Even though there was at least one other employee in the store at the time, she said nothing, believing it would be ill-advised to get other team members involved. (Id. at 395-96.)

For his part, Stonehouse recalled that he visited the store to obtain information about currency missing from a deposit. (Stonehouse Dep. at 40.) He spoke with Moling and a team member named Hal Crumby regarding his concerns. (Id. at 40-41; Moling Dep. at 282.) He denied inviting the Plaintiff to his hotel room or to have a drink with him. (Stonehouse Dep. at 45.) Stonehouse remembered inviting her to play pool, however, explaining that, the last time he visited the south store, he overheard Moling and a male co-worker discussing a small bar she liked to patronize and suggested the next time he was in town they could go there and shoot some pool. (Id.) After he left the store, she did not see him again. (Moling Dep. at 397.)

In October 2008 while Ouellette was still out for his surgery, Moling discovered he had been stealing. (Id. at 365-66.) On October 15, the Plaintiff took off work for her son's wedding in California, intending to return October 21 or 22. (Id. at 400.) On October 20, she learned her

brother had died suddenly and unexpectedly and took several more days off in order to make the necessary arrangements.  (Id. at 400-01.)  On October 30, which was also Ouellette's first day back at work, she had a conference call with Carrington and Norman Hughes, the district manager-in-training working under Carrington, concerning her absences and whether she had properly notified her employer of the unplanned leave taken in association with her brother's death.  (Id. at 402-10.)  The three met the next day, and Moling took the opportunity at that time to complain about the behavior of Ouellette and Stonehouse.  (Id. at 408, 411-12.)  Carrington instructed her to prepare a written statement, which she did, but only as to Ouellette.  (Id.; Moling's Resp. to O'Reilly Auto., Inc.'s Statement of Material Facts, Ex. H.)  As she was preparing the statement in a breakroom, Ouellette walked in, saw his name on the paper Moling was writing, and "went off."  (Moling Dep. at 412.)  Hughes overheard and informed Carrington, who called her back into his office.  (Id. at 412.)  He said, "Why don't we just move you to the south store?"  (Id.)

The Plaintiff's written statement contained the following:  "I expressed my desire, that if I were not terminated, that I would not like to work at the same store as Carl" due to the issues with his wife.  (Id., Ex. 15 at 5.)  She also stated therein, that "[Carrington] then asked me to write this stat[e]ment on my side of this situation.  He stated that he would move me to [the south store] starting on Monday, November 3rd, 2008."  (Id.)

At the conclusion of the meeting, Carrington "offered for [Moling] to go out south to get away from Carl."  (Id. at 427.)  In her deposition she denied that she disagreed with the transfer or that it was involuntary, stating that she just could no longer deal with Ouellette and the issue with his wife on a daily basis.  (Id. at 435-36.)  In an affidavit prepared in connection with her response to the instant motion, she stated that "[a]t the time of [her] demotion from management and transfer

to the South Store, Carrington told [her] that if [she] did not want to work with Ouellette any more, I had to transfer and be demoted." (Aff. of Rhonda Moling ("Moling Aff.") ¶ 5.) She also asserted that she "did not agree to [her] transfer from the North Store as Assistant Manager to the South Store as Parts Specialist. [She] was not given a choice." (Id. ¶ 12.)

Carrington indicated in his deposition that, because of the inability of Moling and Ouellette to work together, he elected to "transfer her out of that environment to the south store." (Carrington Dep. at 71.) According to Carrington, he moved Moling and not Ouellette because "she was the assistant manager at that store, and I needed really her expertise out at the south store because I didn't have an assistant manager out there, and someone with her expertise and ability to be out there, that she did a good job with customer service, and I needed her back out there. And I needed the other store to function without the disruption and so forth." (Id. at 74.) When asked whether the move was a demotion, he replied in the affirmative, but stated that she said she did not want a store manager job, a statement the Plaintiff vehemently denies. (Id. at 75; Moling Aff. ¶ 2.) It is undisputed that her pay remained the same. (Moling Dep. at 440.)

Moling testified that she believed Ouellette wanted to get rid of her because she caught him stealing. (Id. at 437.) She claimed he was also "furious" with her because his back surgery had to be postponed when she was put back in the hospital due to complications from her colon operation. (Id. at 437-39.)

As previously noted, Moling's written statement did not include allegations against Stonehouse. (Id. at 415-16.) She explained the omission by stating she was under the impression that an investigation would be conducted into his activities and, based on Carrington's comment to her that he would "sweep the matter under the rug," that it would be handled quietly without the

knowledge of other employees. (Id. at 415-16, 423.) Carrington kept his word about separating her from Stonehouse; she attended no more inventories, as the auditor would be there, and, when she had to pick up parts on one occasion from a store at which Stonehouse was present, Carrington, who was standing outside smoking, asked another employee to bring them out to her. (Id. at 398-99, 421-23.) Carrington's solution, in Moling's mind, kept her from ever having her own store so long as Stonehouse remained the regional auditor, as store managers had to interact with the individual who held that position. (Id. at 421.) She claims that Carrington tried to mollify her by confiding that he thought Stonehouse might be transferred to Colorado and, if that occurred, she could have her own store again. (Id.)

After the meeting, Moling returned to work at the south store on November 8, 2008 as a parts specialist under the supervision of store manager Mike Jones. (Id. at 440.) She recalled that she and Jones "did not get along for a long time," "had [their] differences," and got into "little spatting matches a couple of times." (Id. at 454-55.) The Plaintiff complained Jones handed out an assignment sheet listing three or four duties for her, one for everyone else at the store, and none for the two black male employees. (Id. at 453.) She related that, on another occasion, a tip was received that an O'Reilly driver had turned in front of someone while talking on a cell phone. (Id. at 442-43.) Moling was blamed and written up for the incident in February 2009 even though there was another driver in the store that day who was male. (Id. at 443-44.) She stated that the other employee, Travis, was interviewed and denied being involved but that no one spoke to her prior to the write-up, which was a violation of company policy. (Id. at 452-53.) Jones screamed at her a few days later during an argument at the store pertaining to the cell phone incident in front of customers and other employees. (Id. at 455, 458.) In response, she left the store and was written up for leaving

her post.  (Id.)  Moling was written up a third time in February 2009 for sending a text message that

she was too sick to come to work, even though, as she conceded, company policy required that such

information be conveyed by telephone.  (Id. at 466-67.)  According to the Plaintiff, a male employee

at the store had sent numerous text messages indicating that he would be late for work.  (Id. at 467.)

In April 2009, Jones gave her a favorable evaluation.  (Am. Mem. of Law in Supp. of Def. O'Reilly

Auto., Inc.'s Am. Mot. for Summ. J., Ex. 19.)

When asked if Jones did not like her because she was female, she replied, "No, I don't think

female had anything to do with it."  (Moling Dep. at 456-57.)  Although he called one evening and

said "Hey, baby" when she answered, she took it as just "playing around" and not a sexual advance.

(Id.)  The Plaintiff asserted in her deposition that the write-ups were the result of her problems with

Stonehouse but could give no specifics about why she thought so.  (Id. at 461-62.)  According to

Moling, everyone at the south store knew she had been transferred there because she might file a

lawsuit, which she associated with her complaints about Stonehouse.  (Id. at 462.)  However, at

another point in her deposition, she claimed that the talk at the south store was of her filing a lawsuit

about Ouellette.  (Id. at 429.)

Jones was replaced by Paul Morton as store manager around the summer of 2009.  (Id. at

478.)  She and Morton had "gotten into it for something" -- she could not remember what -- and, as

she was leaving the store by the back door, she heard him tell someone on his cell phone, "I don't

want the f---ing bitch working here anyway."  (Id. at 478-79.)  Another time, Morton left the safe

open and exited the store.  (Id. at 479.)  Moling, who was supervising the store, noticed it, counted

the money inside, closed the safe and documented the event.  (Id.)  The next day when she asked

Morton to sign the document indicating that the safe had been left open, he became angry and

refused to sign.  (Id. at 480.)  The day after that, he took her off sales and relegated her to the back

of the store.  (Id. at 480.)  She related that "Paul will tell you in a heartbeat he never wants to work

with a woman.  He never wanted me in that store. . . . He had his little women slurs.  If a guy came

in and didn't feel good, he wanted to know if their um-hmm hurt."  (Id. at 481.)  When asked if he

ever told her he did not want women in the store, she replied, "No.  It was slurs like that that made

me believe he didn't want women in the store."  (Id.)  Moling also insisted Morton would tell

customers that she did not know what she was talking about and ask to help them himself.  (Id. at

483.)  She said he treated another employee named Jackie the same way.[3]  (Id.)  He also moved the

Plaintiff's schedule to nights.  (Id. at 484.)

### *ARGUMENTS OF THE PARTIES AND ANALYSIS[4]*

<u>Defendant's Request that Moling's Affidavit be Stricken from the Record.</u>

At the outset, it is necessary for the Court to address a procedural matter.

Contemporaneously with her response to the instant motion for summary judgment, the Plaintiff

submitted her affidavit dated September 13, 2010.  O'Reilly seeks an order striking certain portions

of the affidavit[5] from the record.

Relevant to the Court's analysis of the issues raised by the parties in this matter is

---

[3]The only O'Reilly employee named Jackie referred to by Moling is Jackie Stevenson, a male who also worked at the south store.  (Moling Dep. at 283.)

[4]In her response to the motion, Moling presented arguments relating to claims of wrongful termination and/or for worker's compensation benefits.  In reply, the Defendant argued that the Plaintiff's complaint did not state such claims.  By way of surreply, Moling acknowledged she does not seek damages for wrongful termination.  To the extent the Plaintiff failed to concede any claim herein for worker's compensation benefits, a review of the complaint reveals that she clearly has not asserted such a claim.  Nor has she sought to amend her pleading.

[5]Although the Defendant requested the entire affidavit be stricken, the Court will only consider those portions thereof specifically identified for argument by O'Reilly.

Defendant's assertion with respect to paragraph 16 of the affidavit, which states:

> When Mike Jones would verbally harass me and embarrass me in front of customers and other employees, I would tell him that he was not treating me fairly and ask him to stop. I also discussed with Jones that I was being told that he and corporate wanted to get rid of me. I told him that was retaliation for my reporting of discrimination and harassment.

(Moling Aff. ¶ 16.) It is the position of the Defendant that the statement that Moling was told the company and Jones wanted to get rid of her is inadmissible hearsay.

Rule 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Under Rule 802 of the Federal Rules of Evidence, hearsay is not admissible. Fed. R. Evid. 802. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801©. The party seeking to enter the statement into evidence must establish that it is not hearsay. Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 928 (6th Cir. 1999), *reh'g denied* (June 30, 1999). Clearly, the statement falls within the definition of hearsay. As the Plaintiff has made no attempt to demonstrate otherwise or that some exception to hearsay applies to this statement, the second sentence of paragraph 16 of her affidavit is hereby STRICKEN FROM THE RECORD.

Sexual Harassment.

Under the THRA, "[i]t is a discriminatory practice for an employer to [f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race,

creed, color, religion, sex, age or national origin[.]" Tenn. Code Ann. § 4-21-401(a)(1).  Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., contains a nearly identical provision.

*See* 42 U.S.C. § 2000e-2(a)(1).  Thus, "[b]ecause the Tennessee legislature intended the THRA 'to

be coextensive with federal law,' claims under the [statute] follow the same analysis as those under

Title VII." Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436, 437 n.1 (6th Cir. 2008)

(citing Parker v. Warren County Util. Dist., 2 S.W.3d 170, 172 (Tenn. 1999)).  The prohibition set

forth in the THRA and Title VII "encompasses two types of sexual harassment.  First, it forbids quid

pro quo harassment, which occurs when an employee's submission to unwanted sexual advances

becomes either a condition for the receipt of job benefits, or the means to avoid an adverse

employment action.  [The statutes] also afford[] employees the right to work in an environment free

from discriminatory intimidation, ridicule, and insult, and, to enforce this right, prohibit[] conduct

that creates a hostile environment." Id. at 440 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S.

57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) and Bowman v. Shawnee State Univ., 220 F.3d 456,

461 (6th Cir. 2000)) (internal citation, quotation marks & footnote omitted).

*Quid Pro Quo Sexual Harassment.*

To succeed on a quid pro quo sexual harassment claim, a plaintiff must demonstrate that "(1)

[she] is a member of a protected class; (2) [she] was subjected to unwelcome sexual harassment; (3)

the harassment was based on [her] sex; (4) [her] refusal to submit to the unwelcome demands

resulted in an adverse employment action; and (5) liability may be imputed to the employer."

Sanford v. Main Street Baptist Church Manor, Inc., 327 F. App'x 587, 596-97 (6th Cir. 2009)

(citation & internal footnote omitted).  To satisfy the fourth element, the plaintiff must establish:

"(1) a tangible employment action or detriment; and (2) a causal relationship between the tangible

14

employment action and [the employer's] alleged actions." Id. at 597 (citing Howington, 298 F. App'x at 442-43). "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. Tangible employment actions are significant changes in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, a change in benefits, or other factors unique to [the employee's] particular situation." Id. (internal citations & quotation marks omitted). "In general, a change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (citation & internal quotation marks omitted).

There is some dispute between the parties as to whether Moling in fact has asserted a claim of quid pro quo harassment. The Plaintiff states in her response to the motion for summary judgment that she is proceeding under both theories. In any case, the Court finds that a claim for quid pro quo sexual harassment cannot survive summary judgment.[6]

Moling has described her quid pro quo claim as arising from her refusal to submit to a supervisor's sexual advances which resulted in a tangible job detriment. She submits that she has presented abundant evidence that, subsequent to her report concerning Stonehouse, she was subjected to a downward-spiraling journey of tangible job detriments, including transfer to the south store and removal from the management track, being forced to perform three times the work of other employees, undeserved write-ups, undesirable and dangerous job assignments,[7] and verbal

---

[6]The issue has been thoroughly briefed by both parties.

[7]Moling claimed for the first time in her post-deposition affidavit that Morton assigned her to the most dangerous and undesirable jobs while male employees received safer postings. (Moling Aff. ¶ 13.) No mention was made of these assignments in her approximately 500 page deposition.

harassment. "Quid pro quo sexual harassment is based upon an employer's sexually discriminatory behavior that compels an employee to decide between acceding to sexual demands . . . or suffering tangible job detriments." Reed v. Cracker Barrel Old Country Store, Inc., 133 F. Supp. 2d 1055, 1064 (M.D. Tenn. 2000) (citing Highlander v. KFC Nat'l Mgmt. Co., 805 F.2d 644, 648 (6th Cir. 1986)); *see also* Howington, 298 F. App'x at 442 (in order to succeed, plaintiff must demonstrate "that her refusal to submit to Kirk's sexual demands resulted in a tangible job detriment. Thus, Plaintiff may prevail if she demonstrates that she experienced an adverse employment action, and that this action occurred because of her refusal to have sex with Kirk."). "The employee bears the burden of proof to support charges that . . . the refusal to submit resulted in a tangible job detriment." Reed, 133 F. Supp. 2d at 1064 (citation omitted).

None of the job detriments identified by the Plaintiff resulted from her refusal to have sex with Stonehouse. Indeed, the only action pointed to by Moling that even involved Stonehouse was her transfer and concomitant alleged removal from the management track. The remaining actions, assuming her allegations are true, resulted from Moling's complaints to management about the auditor's behavior, not her refusal to have sex with him. The two are not one and the same. *See* Frank v. Plaza Constr. Corp., 186 F. Supp. 2d 420, 431 n.48 (S.D.N.Y. 2002) ("The question whether Frank was fired for complaining about Fisher's sexual harassment, and thus in retaliation for engaging in activities protected by Title VII, is distinct from the question whether her refusal to have sex with him was a factor in her termination. This latter grievance, if plaintiff properly may be regarded as advancing it, could be an aspect of her quid pro quo sexual harassment claim."); Vandeventer v. Wabash Nat'l Corp., 867 F. Supp. 790, 797-98 (N.D. Ind. 1994), *recons. denied* 887 F. Supp. 1178 (N.D. Ind. 1995) ("Mr. Feltner has made no factual allegations which fall within the

definition of quid pro quo sexual harassment. He seems to confuse quid pro quo with hostile environment and retaliation; he believes that he was fired for his complaints, and therefore has suffered adverse employment effects for 'refusing' to accept the harassment. . . [This is a claim] under retaliation or hostile environment; [this problem is] *not* quid pro quo harassment."). As she has failed to show her refusal to succumb to Stonehouse's alleged requests for sexual favors resulted in transfer and removal from the management track, her quid pro quo harassment claim cannot stand.

*Hostile Work Environment.*

"In order to establish a prima facie case of hostile work environment based on sexual harassment, plaintiff must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." Thornton v. Federal Exp. Corp., 530 F.3d 451, 455 (6th Cir. 2008), *reh'g & reh'g en banc denied* (Oct. 20, 2008) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999)). The Defendant takes issue with the fourth element. "To assess the fourth element, the court must consider all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Id. (citing Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999)) (internal quotation marks omitted). The court is to determine "whether the workplace is permeated with discriminatory intimidation, ridicule, and insult[.]" Perkins v. Harvey, 368 F. App'x 640, 645-46 (6th Cir. 2010) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (internal quotation marks omitted).

"The conduct in question must be judged by both an objective and a subjective standard:  the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. " Thornton, 530 F.3d at 455 (quoting Jackson, 191 F.3d at 658) (internal quotation marks omitted). "Conduct must be extreme to amount to a change in the terms and conditions of employment." Conley v. City of Findlay, 266 F. App'x 400, 408 (6th Cir. 2008) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)).  "Consequently, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Id. (citation & internal quotation marks omitted).

Moling points to the following incidents as evidence that she suffered from a hostile work environment:  (1) Stonehouse's behavior on the day they met in March 2008; (2) occasional phone conversations with Stonehouse between March and October 2008 in which he engaged in "little flirty talk"; (3) Stonehouse's October 2008 visit to the store during which he invited her to his hotel; (4) Carrington's failure to investigate her complaints about Stonehouse and his decision to instead transfer her to stop the harassment; (5) Ouellette's statement that he would have to get rid of her because his wife was jealous; (6) the instruction that, if she needed Ouellette's assistance when he was out of the store, she must ask one of the male employees to make the call for her; (7) Jones' actions in giving her undeserved write-ups, forcing her to perform more work than other employees, screaming at her and blaming her for everything; (8) Morton's statements that he did not want a woman working in his store, that women were incapable to doing the kind of work required by O'Reilly, and that he "didn't want the f---ing bitch working here anyway"; (9) removal from sales

activities, thereby insuring her eventual termination in light of the Defendant's sales volume requirements; and (10) assignment to the most undesirable and dangerous jobs in the store, which ultimately resulted in injury to the Plaintiff when she fell from a ladder.

In her deposition, the Plaintiff indicated that Carrington's admonition that she not phone Ouellette was not part of her lawsuit, to wit:

> A:    . . . That was [Ouellette's] wife's deal. It wasn't me and Carl having a problem. It was his wife having a problem.
>
> Q:    But you've talked extensively about that. Do you contend that that's part of your lawsuit, that situation?
>
> A:    That's his wife's problem. His wife is the one that had the problem of me and Carl talking. Okay?
>
> Q:    Well, I understand there, Ms. Moling, but is that part of your lawsuit, though, that conduct?
>
> A:    The conduct that he used considering he would come to work with his smart little comments is the part of the lawsuit that I am talking about.
>
> Q:    Okay. Not the inability to call him.
>
> A:    Right. It's the fact that his wife took it way out of context, and he thought it was a cutesy.

(Moling Dep. at 505-06.) She also testified that Jones' issues with her were not based on sex. There is no evidence that her removal from sales by Morton was based on her gender. Even assuming the remaining allegations were based on sex, Moling has failed to establish the harassment she suffered "was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive," and that she "subjectively regard[ed] that environment as abusive." *See* Thornton, 530 F.3d at 455.

Two recent Sixth Circuit decisions addressing hostile work environment based on sex offer

some guidance.  In <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263 (6th Cir. 2009), *reh'g & reh'g en banc denied* (July 27, 2009), the plaintiff worked in close contact with other members of the defendant's sales staff in one of several cubicles arranged in pods separated by short dividers. <u>Gallagher</u>, 567 F.3d at 266-67.  The male employees openly and loudly referred to female customers, truck drivers, co-workers and others as bitches, whores, sluts, dykes and cunts.  <u>Id.</u> at 267.  Her co-workers viewed sexually explicit photos on their computers; left pornographic magazines open on their desks; brought nude pictures of their girlfriends to share; traded sexual jokes, stories, fantasies and preferences in her presence on a daily basis and called her a "heifer" with "milk udders" and "moo"ed at her.  <u>Id.</u>  On one occasion, a male co-worker, wearing only a towel, sat on a nearby desk, displaying his whole thigh, and engaged in discussions with other male employees about anal sex.  <u>Id.</u> at 268.  When she complained, her supervisor would simply yell at the offending employee to stop bothering her, which led to more ridicule.  <u>Id.</u>  Gallagher averred that she left the office every day in tears.  <u>Id.</u> at 274.  On these facts, the Sixth Circuit overruled the lower court's grant of summary judgment, finding that she had presented sufficient evidence of a hostile work environment.  <u>Id.</u> at 273-74.

In contrast, in <u>Hensman v. City of Riverview</u>, 316 F. App'x 412 (6th Cir. 2009), the plaintiff alleged that her supervisor claimed to have not been listening to her during a discussion because he was too distracted by how attractive she was; complimented her perfume on several occasions, asked what it was, and "sniffed" her; twice told her she was voluptuous and "well-endowed" when comparing her to his wife and mother-in-law; closed the door when she was in the office; hugged her on three different occasions; grabbed her arm so tightly it left a mark; walked too closely behind her and called her by the wrong name.  <u>Hensman</u>, 316 F. App'x at 413-15.  When he had to pick up

a key from her house one night and she appeared at the door in a bathrobe, he complimented her on her "jammies." Id. at 413-14. The next day, he brought her a bouquet of flowers and bagels by way of apology for the remark. Id. Nonetheless, she was humiliated because everyone knew about the incident and thought it was funny. Id.

The Sixth Circuit concluded Hensman had failed to show her supervisor's actions created a hostile work environment. Id. at 416-17. In making its determination, the court compared Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321 (6th Cir. 2008), in which the supervisor made "continual, crass requests for oral sex, regularly rubbed against the plaintiff with his private parts, and touched or grabbed her every time they worked together" and Williams v. General Motors Corp., 187 F.3d 553 (6th Cir. 1999), where the plaintiff "was subjected to continual, crude sexual propositions, derogatory remarks about women, and physical pranks, such as being hit by a thrown box and being locked in her work area" -- cases where a prima facie case of hostile work environment had been shown, to those where one had not, illustrated by Clark v. United Parcel Service, Inc., 400 F.3d 341 (6th Cir. 2005), in which a supervisor "told vulgar jokes, twice pressed his vibrating pager against plaintiff's thigh, and once pulled her overalls when she said she was wearing a thong," and Stacy v. Shoney's, Inc., [No. 97-5393, 1998 WL 165139 (6th Cir. Mar. 31, 1998)], where a supervisor "made continual sexual comments and touched plaintiff's breast while removing a pen from her shirt pocket." Id.

In this case, Stonehouse leaned Moling over a desk and attempted to kiss her on one occasion and asked her out twice, in March and October 2008. By her own admission, she rarely saw him otherwise. He made "flirty" phone calls to her on at most four occasions between March and October 2008. With respect to Ouellette, according to her deposition, his comments concerning his

wife's jealousy of her began in June 2008. Moling was discharged for her surgery on June 21, 2008 and was not rehired until August 25, 2008. Ouellette was out from September 8 through October 27, 2008, after which no more such incidents occurred. Thus, his teasing could have only lasted less than a month at most.[8] While Morton's "little woman slurs" were unfortunate, the evidence before the Court does not support a finding that they were either severe or pervasive. Thus, the Court finds that the contentions made by Moling fall more in line with the Sixth Circuit cases in which a hostile work environment had not been demonstrated. *See, supra; see also see also* Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (plaintiff's allegations that supervisor asked her for dates, touched her shoulder several times, attempted to kiss her in a bar, and placed "I love you" signs in her work area failed to establish hostile work environment claim); Davis v. Verizon Wireless, 389 F. Supp. 2d 458, 475-76 (W.D.N.Y. 2005) (supervisor's propositions made on two occasions not sufficient to create triable issue of fact). Accordingly, the Plaintiff's hostile work environment must fail.[9]

Gender Discrimination.[10]

---

[8]Moling's insistence that the actions of Stonehouse and Ouellette "unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment" is somewhat belied by the fact that she agreed to be rehired by O'Reilly. Indeed, she acknowledged in her deposition that after her surgery she could have obtained employment at Advance Auto Parts or another store at which she had worked previously, but voluntarily chose instead to return not only to O'Reilly but to the store managed by Ouellette. (Moling Dep. at 377-78.)

[9]In light of the Court's determination, it is unnecessary to address the parties' remaining arguments relative to Moling's sexual harassment claims. *See* Drain v. Cozza-Rhodes, No.06-CV-15489, 2007 WL 4181308, at *4 n.3 (E.D. Mich. Nov. 27, 2007) (based on court's finding that summary judgment was appropriate, it need not address the remaining arguments in support of the motion as to that claim).

[10]Like the quid pro quo claim, the Plaintiff's claim for gender discrimination was not argued in the motion for summary judgment. After Moling asserted in her response that it

"A plaintiff can establish a claim of sex discrimination . . . by producing either direct or circumstantial evidence of discrimination."  White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 238 (6th Cir. 2005) (citing DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004)).  Moling argues that she suffered discrimination at the hands of her employer based on direct evidence.  Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in the adverse action taken by the employer.  Id. (quoting Jacklyn, 176 F.3d at 926); see also Gross v. FBL Fin. Servs, Inc., ___ U.S. ___, 129 S. Ct. 2343, 2349, 174 L. Ed. 2d 119 (2009).  Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice[.]"  Grubb v. YSK Corp., No. 09-4352, 2010 WL 4807079, at *4 (6th Cir. Nov. 18, 2010) (quoting DiCarlo, 358 F.3d at 415).  "The evidence must establish not only that the plaintiff's employer was predisposed to discriminate but also that the employer acted on that predisposition."  Id. (quoting DiCarlo, 358 F.3d at 415).  "Evidence of discrimination is not considered direct evidence unless an improper motivation is explicitly expressed."  Id. (quoting Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006)).

"Once the plaintiff has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination."  White, 429 F.3d at 238 (citing Jacklyn, 176 F.3d at 926).  "[T]he critical

---

appeared O'Reilly did not seek dismissal thereof, Defendant contended in its reply that she never pled a claim of gender discrimination independent of her claims of sexual harassment.  However, as the complaint alleges "discriminatory treatment based on sex and hostile work environment based on sex" (Compl. ¶ 57) and generally refers to sexual harassment, discrimination, and retaliation engaged in by her employer, the Court will address the separate claim for gender discrimination.  Both parties have briefed the issue.

inquiry in a sex discrimination case is whether gender was a factor in the employment decision at the moment it was made." Id. at 239 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 241, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)) (emphasis omitted).

The Plaintiff contends that the following acts of O'Reilly were direct evidence of gender discrimination: (1) her transfer to the south store; (2) Morton's refusal to permit her to make sales; and (3) his verbal harassment and assignment of undesirable and/or dangerous jobs. Morton's alleged comments concerning women are not direct evidence of gender discrimination. The alleged statements that he "didn't want the f---ing bitch working here anyway" and asking male workers if their "um hmm" hurt require the trier of fact to infer that the comments were discriminatory in nature. See Shorter v. Memphis Light, Gas & Water Co., 252 F. Supp. 2d 611, 627 (W.D. Tenn. 2003) (ambiguous comment requiring inference of its discriminatory nature not direct evidence). Although Moling averred that Morton "will tell you in a heartbeat" he did not want women working in the store, she acknowledged he never made such a statement to her and did not offer evidence as to when such comments were made or to whom. Morton's alleged statements to customers that she did not know what she was talking about are not direct evidence of discrimination because the same comments were made by the supervisor about a male employee.

Morton's removal of Moling from sales duties is not direct evidence of unlawful gender discrimination as, according to her deposition, he took the action because she asked him to sign the document admitting the safe had been left open. (See Moling Dep. at 480.) Assignment of undesirable duties and transfer to the south store also require that inferences be drawn by the factfinder in order to conclude that the Defendant's actions were motivated at least in part by unlawful discrimination. Thus, they are not direct evidence of discrimination. See White, 429 F.3d

at 238; <u>Grubb</u>, 2010 WL 4807079, at *4.

The Plaintiff asserts that, even if she cannot establish a gender discrimination claim on direct evidence, her claim may nonetheless be demonstrated through circumstantial evidence. Moling must first demonstrate a prima facie case of gender discrimination by showing "(1) she was a member of a protected class; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) a similarly situated non-protected employee was treated more favorably or she was replaced by someone outside the protected class." *See* <u>Neview v. D.O.C. Optics Corp.</u>, 382 F. App'x 451, 457 (6th Cir. 2010) (citations omitted). Under the familiar burden-shifting analysis set forth by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), once the plaintiff demonstrates a prima facie case of discrimination, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory explanation for its actions; finally, if the defendant meets this burden, the plaintiff bears the burden of establishing that the proffered reason was pretextual. <u>Id.</u>

The first and third elements of the prima facie case are not at issue here. Even if the Plaintiff could succeed in demonstrating the second, she has failed as to the fourth. Moling has not alleged that she was replaced by someone outside the protected class. Thus, to establish the fourth prong of the prima facie case, she must show that she was treated differently from other similarly situated employees. *See* <u>Neview</u>, 382 F. App'x at 457. In doing so, "the plaintiff must demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." <u>Dickens v. Interstate Brands Corp.</u>, 384 F. App'x 465, 468 (6th Cir. 2010) (quoting <u>Ercegovich v. Goodyear</u>

Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)) (emphasis in original).

"In evaluating a proposed comparator, courts 'should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.'" Perkins, 368 F. App'x at 644 (quoting Ercegovich, 154 F.3d at 353). "This means the plaintiff must prove that all of the relevant aspects of [her] employment situation are 'nearly identical' to those of the non-[protected] employees who [she] alleges were treated more favorably." Hatchett v. Health Care & Retirement Corp. of Am., 186 F. App'x 543, 548 (6th Cir. 2006) (citation & internal quotation marks omitted). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." Id. (citing Leadbetter v. Gilley, 385 F.3d 683, 691 (6th Cir. 2004)). In the disciplinary context, the plaintiff and her proposed comparator must have "engaged in acts of 'comparable seriousness.'" Dickens, 384 F. App'x at 468 (citing Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002)). To make that assessment, the court may consider whether they "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Ercegovich, 154 F.3d at 352).

Moling identifies two individuals as being similarly situated: Stonehouse and Ouellette. She contends that Stonehouse was not reprimanded for his harassment of her and Ouellette was not transferred or removed from management because of his jealous wife. Neither is similarly situated. The only similarity between the Plaintiff and these two males is that she and Ouellette were at one point both store managers in Jackson. At the time of her transfer, Moling was under the supervision of Ouellette. As manager of the north store, his responsibilities were different from hers.

Stonehouse was located in another part of the country, had a completely different type of job and was under different supervision. Moreover, the men had not engaged in any actions that were similar to hers. In this case, an example of a similar comparator would be a male who had complained about sexual harassment who was not transferred/demoted/removed from the management track. Because she has failed to identify a similarly situated employee who was treated differently, Moling's gender discrimination claim based on circumstantial evidence fails.

Retaliation.

The THRA prohibits an employer from "[r]etaliat[ing] . . . in any manner against a person because such person has opposed a practice declared discriminatory by [the statute] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under" the THRA. Tenn. Code Ann. § 4-21-301(1). In order to establish a prima facie case of statutory retaliation based on circumstantial evidence, a plaintiff must show that (1) she engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subjected to materially adverse action or severe or pervasive retaliatory harassment, and (4) there was a causal connection between the protected activity and the adverse action. Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009), *reh'g denied* (Mar. 27, 2009). The plaintiff's burden in establishing a prima facie case is not an onerous one. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008).

The Plaintiff maintains in this action that her employer retaliated against her for her complaints concerning Stonehouse and Ouellette. The parties' dispute centers on the presence of an adverse employment action. Moling identifies the following retaliatory actions taken by her employer as adverse: (1) transfer to a smaller store and demotion from management to the position

of parts specialist, (2) assignment of additional work, (3) undeserved write-ups, (4) assignment to undesirable and dangerous duties and (5) verbal abuse.

Assignment to undesirable, difficult or heavier duties is not an adverse employment action. *See* Morales-Vallellanes v. Potter, 605 F.3d 27, 39-40 & n.17 (1st Cir. 2010), *cert. denied,* ___ S. Ct. ___, 2011 WL 55466 (U. S. Jan. 10, 2011) (No. 10-654) (assignment to more difficult and dirty jobs not adverse employment action); Arrieta v. Yellow Transp., Inc., Civ. Action No. 3:05-CV-2271-D, 2008 WL 5220569, at *15 (N.D. Tex. Dec. 12, 2008), *recons. denied,* 2009 WL 129731 (N.D. Tex. Jan. 20, 2009) (assignment to heavier work not adverse). Nor are offhand remarks. *See* Conley, 266 F. App'x at 408. Employee discipline is not adverse where it has no effect on pay or promotional opportunities, or where it does not result in probation. *See* Williams v. AP Parts, Inc., 252 F. Supp. 2d 495, 497-98 (N.D. Ohio 2003). None have been shown here.

"Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by salary or work hour changes." Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010) (citing Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885-86 (6th Cir. 1996)) (internal quotation marks omitted). "And even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. (citing Kocsis, 97 F.3d at 886) (internal quotation marks omitted). It has been held, however, that "[t]ransfers intended to respond to and resolve an employee's problems with another employee do not constitute adverse employment action." Kasprzak v. DaimlerChrysler Corp., 431 F. Supp. 2d 771, 777 (N.D. Ohio 2005), *mot. to vacate denied by* 431 F. Supp. 2d 779

(N.D. Ohio 2006) (citing Walker v. National Revenue Corp., 43 F. App'x 800, 805 (6th Cir. 2002)).

Carrington's response to Moling's complaint was to remove her from the store in which she had contact with Stonehouse and Ouellette. Moling testified in her deposition that

> [it] cut me out of a lot of things. It cut me out of any management positions because the manager has to work with the auditor. So I was sent to another store and demoted down to parts, and never again would I have my own store as long as Bob is in this region. [Carrington] even went to the point of saying that he thought Bob [Stonehouse] was fixing to move to the Colorado are as a regional manager there, and that would free up me being able to get my own store again.

(Moling Dep. at 421.) While there is no proof Moling suffered a decrease in pay or benefits as a result of the transfer to another store as parts specialist, a reasonable factfinder could find that she suffered a loss of status. *See* Karges v. Charleston County Sheriff's Office, C. A. No. 2:08-cv-2163-MBS, 2010 WL 3270310, at *7 (D. S.C. Aug. 17, 2010) (loss of status constituted adverse employment action for purposes of determining prima facie case).

Assuming the Plaintiff has established a prima facie case of retaliation, the Court moves to the next stage of the analysis. The McDonnell Douglas/Burdine paradigm has long been used by federal as well as Tennessee state courts to assess retaliation claims. *See* Spengler v. Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010), *reh'g & reh'g en banc denied* (Sept. 10, 2010); Bennett v. ERMCO Components, Inc., No. 07-2305, 2008 WL 867894, at *3 (W.D. Tenn. Mar. 28, 2008). However, during the pendency of this motion the Tennessee Supreme Court issued its opinion in Gossett v. Tractor Supply Co., Inc., 320 S.W.3d 777 (Tenn. 2010), which calls into question the continuing utilization of the McDonnell Douglas framework for state retaliation claims.

Gossett sued his employer for common law retaliatory discharge.[11] Gossett, 320 S.W.3d at

---

[11] Gossett addressed only the analysis to be applied to *common law* retaliation claims. The Court will assume Gossett governs both types of retaliation, although some courts have held otherwise. *See* Philip v. Wrigley Mfg. Co., LLC, No. 1:09-CV-144, 2010 WL 4318880, at *11

780. In its motion for summary judgment, the defendant argued that a decision in its favor was warranted under McDonnell Douglas. Id. The court opined, however, that the case before it presented an opportunity to reassess the continued viability of McDonnell Douglas in the context of the Tennessee summary judgment law. Id. at 781-82. The court explained that

> [s]ummary judgment operates to dispose of a case only when it presents no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. [Rule 56.04 of the Tennessee Rules of Civil Procedure][12] therefore precludes trial courts from deciding issues of material fact in ruling on a motion for summary judgment. To show that a case presents no genuine issue of material fact, a party moving for summary judgment must produce evidence or refer to evidence in the record that affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial. To affirmatively negate an essential element of the nonmoving party's claim, the moving party must point to evidence that tends to disprove a material factual allegation made by the nonmoving party. If the moving party fails to satisfy this burden of production, summary judgment is not warranted.

> Evidence satisfying an employer's burden of production pursuant to the McDonnell Douglas framework does not necessarily demonstrate that there is no genuine issue of material fact. The McDonnell Douglas framework requires only that an employer offer evidence establishing a legitimate alternative to the reason for discharge alleged by the employee. A legitimate reason for discharge, however, is not always mutually exclusive of a discriminatory or retaliatory motive and thus does not preclude the possibility that a discriminatory or retaliatory motive played a role in the discharge decision. Indeed, Title VII of the Civil Rights Act recognizes that an adverse employment action may be the result of both a legitimate reason and a discriminatory motive. Furthermore, evidence showing a legitimate reason for discharge can satisfy the requirements of the McDonnell Douglas framework without tending to disprove any factual allegation by the employee. An employer therefore may meet its burden of production pursuant to McDonnell Douglas without satisfying the burden of production set forth in Tennessee Rule of Civil Procedure 56.04 for a party moving

n.5 (E.D. Tenn. Oct. 22, 2010) ("Following [Gossett], Tennessee *common law* retaliation claims are no longer analyzed under the same analytic framework as Title VII and THRA retaliation claims. Plaintiff does not assert common law retaliation in this case.").

[12]Under Rule 56.04, "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

for summary judgment.

Id. at 782 (internal citations & quotation marks omitted).

The court expressed its concern that the McDonnell Douglas inquiry "may result in trial courts disposing of factual questions on summary judgment," particularly with respect to questions involving pretext, stating that "[w]hen focusing solely on whether the employee showed a genuine issue of material fact regarding the employer's proffered reason, a court may overlook the employee's evidence establishing the prima facie case. This oversight causes a court to contravene our instruction that evidence must be construed in a light most favorable to the employee as the nonmoving party and can result in an improper grant of summary judgment." Id. at 783 (internal citations omitted). In Tennessee, the court noted, "a court considering a summary judgment motion must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." Id. at 784 (citation & internal quotation marks omitted). Accordingly, the court held that "the McDonnell Douglas framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence." Id. at 785 (footnote omitted).

It is the position of the Plaintiff that the summary judgment standard espoused by the Gossett court should be applied to the case at bar, as it is substantive. Under the doctrine articulated in Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), federal courts sitting in diversity are to apply state substantive law and federal procedural law. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427, 116 S. Ct. 2211, 2219, 135 L. Ed. 2d 659 (1996). However, as the Supreme Court recognized in Gasperini, "[c]lassification of a law as 'substantive' or 'procedural' for Erie purposes is sometimes a challenging endeavor." Id., 116 S. Ct. at 2219

(footnote omitted). That is certainly the case here.

Guidance in ruling on the issue can be found in <u>Guaranty Trust Co. v. York</u>, 326 U.S. 99, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945), *reh'g denied* (Oct. 8, 1945), in which the Supreme Court set out the "outcome-determinative" test requiring the trial court to consider whether the law "significantly affect[s] the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court[.]" <u>York</u>, 326 U.S. at 109, 65 S. Ct. at 1470. The Court articulated that "where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." <u>Id.</u>, 65 S. Ct. at 1470. The holding in <u>York</u> was later qualified in <u>Hanna v. Plumer</u>, 380 U.S. 460, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965), in which the Court noted that the outcome-determinative test "must not be applied mechanically to sweep in all manner of variations; instead, its application must be guided by the twin aims of the <u>Erie</u> rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." <u>Gasperini</u>, 518 U.S. at 428, 116 S. Ct. at 2220 (quoting <u>Hanna</u>, 380 U.S. at 468, 85 S. Ct. at 1142). If the state law is outcome-determinative, the court must then consider whether countervailing federal interests nonetheless justify application of federal law. *See* <u>Byrd v. Blue Ridge Rural Elec. Co-op, Inc.</u>, 356 U.S. 525, 537-39, 78 S. Ct. 893, 901, 2 L. Ed. 2d 953 (1958), *reh'g denied* (June 23, 1958).

While the Sixth Circuit has not addressed the issue now before this Court, decisions from other circuits offer some assistance. In <u>Snead v. Metropolitan Property and Casualty Insurance Co.</u>, 237 F.3d 1080 (9th Cir.), *cert. denied*, 534 U.S. 888, 122 S. Ct. 201, 151 L. Ed. 2d 142 (2001), the

Ninth Circuit Court of Appeals was presented with a closely similar question. In that case, the plaintiff argued the defendant was not entitled to summary judgment because Oregon summary judgment law in employment cases required only that a plaintiff establish a prima facie case of discrimination while the defendant maintained the court should apply McDonnell Douglas. Snead, 237 F.3d at 1090. The court concluded that the Oregon summary judgment rule was not outcome-determinative, explaining that

> [t]he only significant difference between the state and federal regimes is *when* a case that fails one of the McDonnell Douglas components will be dismissed. For example, a plaintiff whose case could not survive summary judgment on the third McDonnell Douglas component in federal court for lack of evidence would only delay the inevitable by proceeding in state court where, on the same record, a nonsuit or JNOV would be in order at the close of the plaintiff's case. In either case, the court would ultimately apply the same substantive law, employ the same reasoning, and produce the same result. Only the timing of the case's dismissal (along with the added expense of bringing the case to trial) would differ.

Id. at 1091 (emphasis in original). The court also found that the ultimate identical outcomes in cases filed in federal and state courts would serve the twin aims of Erie. Id. Moreover, the Ninth Circuit opined that overriding federal interests favored characterization of the McDonnell Douglas paradigm as procedural, stating that

> [i]f federal courts sitting in diversity were compelled to follow [state law], nearly every case of employment discrimination filed under [state] law would go to trial, providing an increased burden on the district courts' already crowded trial dockets. This burden is too high a price to pay for an outcome that would be identical if all three McDonnell Douglas components were applied at the summary judgment stage rather than at trial.
>
> Furthermore, the federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury. The policy of uniform enforcement of state-created rights and obligations cannot in every case exact compliance with a state rule -- not bound up with the rights and obligations -- which disrupts the federal system of allocating functions between judge and jury.

Id. at 1091-92 (internal citations & quotation marks omitted). Finally, the court noted that the United States Supreme Court, in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 521, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), stated that "the McDonnell Douglas presumption is a *procedural* device, designed only to establish an order of proof and production." Id. (quoting Hicks) (emphasis in original).

In 2010, the Seventh Circuit went a step further in Gacek v. American Airlines, Inc., 614 F.3d 298 (7th Cir. 2010). As in Snead, the Gacek court was faced with the question of whether the framework for deciding an employer's motion for summary judgment in a state (this time Illinois) retaliatory discharge case lay in federal law -- McDonnell Douglas -- or state law. Gacek, 614 F.3d at 300. The court noted, in an opinion authored by Circuit Judge Posner, that "[u]nanswered [in Snead] was the question whether, if a state adopts a procedural rule that differs from the federal procedural rule, and does so for reasons of substantive policy (in the present case, to bring about uniformity in proving tort cases), the federal courts are required to apply the state rule in a case governed by state substantive law if applying the state rule rather than the federal one might alter the outcome of the litigation." Id. at 301.

This was not the first time Judge Posner had written about the issue. In a concurring opinion in Bourbon v. Kmart Corp., 223 F.3d 469, 474 (7th Cir. 2000), he pointed out that, in Clemons v. Mechanical Devices Co., 704 N.E.2d 403 (Ill. 1998), the Illinois court decided that "to follow McDonnell Douglas in an Illinois retaliatory-discharge case 'would, in essence, expand the tort of retaliatory discharge by reducing plaintiff's burden of proving the elements of the tort. Because we refuse to expand the tort of retaliatory discharge, we decline plaintiff's invitation to adopt the three-tier allocation of proof method in retaliatory discharge cases.'" Bourbon, 223 F.3d at 474 (Posner,

J., concurring) (quoting <u>Clemons</u>, 704 N.E.2d at 408). Judge Posner opined therefore that "[i]n rejecting <u>McDonnell Douglas</u> for retaliation cases, the objective of the Illinois court likewise was manifestly substantive, namely to avoid expanding the tort of retaliatory discharge. . . . [T]he state's goals are substantive -- designed to shape conduct outside the courtroom and not just improve the accuracy or lower the cost of the judicial process -- though the means are procedural." <u>Id.</u> at 475 (Posner, J., concurring) (internal citations & quotation marks omitted).[13] In <u>Gacek</u>, the Seventh Circuit answered the question left unaddressed by <u>Snead</u> in the affirmative, holding that "when a retaliatory discharge case governed by Illinois law is litigated in a federal court, the federal court must apply the standard of the state law to a motion for summary judgment, and not the federal standard, because the standards are materially different and the difference is rooted in a substantive policy of the state." <u>Gacek</u>, 614 F.3d at 303.

After a careful reading of <u>Gossett</u>, the Court is unable to discern the presence of any "substantive policy" such as that at work in <u>Clemons</u>. That is, there is nothing to suggest the Tennessee Supreme Court sought to "shape conduct outside the courtroom" or affect the scope of retaliation claims in general. Nor is the Court willing to read into the opinion possible intentions and goals of the state court justices that were neither expressed nor intimated. Thus, the Court finds the reasoning in <u>Gacek</u> and in Judge Posner's concurring opinion in <u>Bourbon</u> unpersuasive in this case.

Rather, the Court finds the Ninth Circuit's analysis in <u>Snead</u> compelling and adopts it here. As in <u>Snead</u>, the only distinction in this case between the federal and state methods of determining

---

[13]In <u>Bourbon</u>, the Seventh Circuit did not have to decide which standard to apply. *See* <u>Bourbon</u>, 223 F.3d at 476 ("Someday we'll have to decide what the prima facie case of retaliation is in the Seventh Circuit.").

whether dismissal of a retaliation claim is appropriate is when that dismissal will occur -- at the summary judgment stage or at trial.  If Moling cannot satisfy the McDonnell Douglas burdens at the summary judgment stage, she will not be able to do so at trial.  The only difference between the two will be the expense of trial preparation.  In addition, federal interests militate in favor of the application of the McDonnell Douglas framework as, like the court recognized in Snead, nearly every case brought before this Court on diversity grounds that alleged retaliation under Tennessee law would go to trial, wreaking havoc on the Court's docket.

Finally, while the Plaintiff attaches much importance to the fact that application of McDonnell Douglas might result in different outcomes, the Court is unconvinced that this factor is of overriding concern, as is illustrated in Shropshire v. Laidlaw Transit, Inc., 550 F.3d 570 (6th Cir. 2008), cert. denied, ___ U.S. ___, 130 S. Ct. 110, 175 L. Ed. 2d 32 (2009).  In Shropshire, the Sixth Circuit addressed, in a personal injury case, the procedural/substantive distinction with respect to Fed. R. Civ. P. 56 and a Michigan state law instructing courts that "for a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury."  Shropshire, 550 F.3d at 571 (quoting Mich. Comp. Laws § 500.3135(2)(a)(ii)).  Upon satisfying this provision, a Michigan plaintiff is entitled to take his case to the jury.  Id. at 576 n.5.  The court held as follows:

> [W]e recognize that because Rule 56 and [the state law] set forth different standards for plaintiffs at this stage of litigation, it is inevitable that our decision to apply the federal rule over the state statute will, on occasion, lead to different outcomes.  But this is no barrier to the application of the federal standard, given the strong federal policy of not permitting state law to interfere with the judge-jury relationship in the federal courts.  Moreover, this difference in outcome should be exceedingly rare.  *The evidence we require of a plaintiff to survive summary judgment is by definition some lesser quantum of the same evidence she would eventually have to produce if*

*she were to prevail at trial. If she cannot produce the minimal evidence required to survive summary judgment, there is no reason to think she would have prevailed at trial. Therefore, we are not overly concerned that our decision today will lead to different outcomes in federal as opposed to state court.*

Id. at 576 (internal citations, quotation marks & footnotes omitted) (emphasis added).

Based upon the Court's conclusion that the standard to be applied at the summary judgment stage is procedural, it will at this point analyze Moling's retaliation claim under McDonnell Douglas. The Defendant avers herein that the legitimate nondiscriminatory reason for the transfer to the only other O'Reilly store in Jackson, Tennessee was to separate her from Stonehouse and Ouellette based on her complaints.

At this juncture, Moling must "rebut [her] employer's legitimate, nondiscriminatory reason and show pretext by demonstrating that: (1) the employer's stated reason for [taking the action] has no basis in fact, (2) the reason offered for [the action] was not the actual reason . . ., or (3) the reason offered was insufficient to explain the employer's action." Spengler, 615 F.3d at 493 (quoting Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008)). The Plaintiff submits that the proffered reason fails because there is no basis in fact that she agreed to and/or requested the transfer to the south store.

In her deposition, the Plaintiff testified as follows:

Q:    And so is it -- are you telling me that your transfer then was not voluntary; you did not agree with it?

A:    No. That's not what I told you.

Q:    Okay. Did you want the transfer? Well, I guess I assumed that since you said nothing was done and --

A:    When we were referring to Carl, if you'll look as to what I wrote in here, okay, I told him I could not work with Carl.

Q:      Anymore?

A:      Anymore.

Q:      Okay.

A:      Because of the situation with his wife, his mouth about his wife, to me, made a very hostile environment for me to go to work every day knowing what I was going to have to hear the minute I clocked in.

(Moling Dep. at 435-36.)  In her written statement, to which she referred in her testimony, she clearly stated that she told Carrington she did not want to work at the same store as Ouellette due to his wife's accusations and noted Carrington promised to transfer her to the south store soon.  (*See* Moling Dep., Ex. 15 at 5.)  Moling gave no indication in the statement that she believed she was being transferred because of discrimination or retaliation.  Whether she expressly requested the transfer or believed it the best solution to the problem does not render O'Reilly's stated reason without basis in fact and, therefore, a pretext for retaliation.  Simply put, the uncontroverted evidence is that she did not want to work at the same store as Ouellette and Carrington accommodated her by transferring her to the only other store in the city, which she accepted.  Thus, since Moling has failed to establish pretext, her retaliation claim cannot survive summary judgment.

## CONCLUSION

For the reasons set forth herein, the motion for summary judgment is GRANTED and this matter is DISMISSED in its entirety.  The Clerk is DIRECTED to enter judgment for the Defendant.

IT IS SO ORDERED this 13th day of January 2011.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE